[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a suit for dissolution of marriage brought by the plaintiff husband against the defendant wife. The parties were married on March 23, 1991 in New York City, New York. There are no children issue of the marriage. The plaintiff, in his complaint, seeks a dissolution of the marriage, enforcement of the parties' Postmarital Agreement dated July 26, 1991 and their Modification Agreement dated January 17, 1994 and such other, further, and different relief as the court may deem proper. The defendant filed an answer admitting all of the allegations in the plaintiff's complaint. The defendant also filed a two count cross-complaint. The defendant, in the first count of her cross-complaint, seeks a dissolution of the marriage, alimony, counsel fees and a division of the parties' property.[1]
The plaintiff is forty-nine years of age. He graduated from the Pennsylvania State University and has taken some law classes. The plaintiff is unemployed. The defendant is forty eight years of age. She graduated from Douglas College and the National Law Center at George Washington University. The defendant is an attorney and works as an associate for the law firm of Hurwitz and Sargarin.
This marriage is the second for both parties. The plaintiff's first marriage ended in December, 1989, when his wife died of cancer. The plaintiff has two children from his first marriage. The defendant's first marriage ended by way of divorce. The parties have known each other since 1970. In May, 1990, after the plaintiff's wife died, the parties became more than friends and eventually married.
At the time of the marriage, the plaintiff resided in Weston, Connecticut and the defendant resided in Virginia. The defendant gave up being a partner in the Washington D.C. law firm of Cole, Raywid Braverman in order to enter into the marriage with the plaintiff.
Approximately one month after the marriage, the defendant needed to return to D.C. to argue motions on a trial she had completed prior to the marriage. The trip was necessitated by the death of the attorney with whom the defendant had tried the CT Page 89 case. The plaintiff was not happy about the defendants leaving himself and his children and warned the defendant that if she left he would file for divorce. The plaintiff followed through on his threat and commenced divorce proceedings in Virginia. On July 26, 1991, during the pendency of the divorce proceedings, the parties entered into a postmarital agreement (the "Agreement"). Exhibit B. The Agreement provided for the amicable settlement of the property affairs of the parties and provided for the withdrawal of the divorce proceedings. The divorce proceedings in Virginia were subsequently withdrawn by the plaintiff pursuant to the terms of the Agreement. The Agreement was modified on January 17, 1994 by a document entitled "Modification Agreement". Exhibit A.
Prior to the marriage, the plaintiff was an officer and shareholder of Commons Brothers, Inc. He was responsible for the sales and marketing side of the business. Sometime between December, 1988 and December, 1989, the plaintiff decided he wanted to spend more time with his ailing wife and children. After his wife died his priorities changed and he started spending more time at home with his children and less time at work. In January, 1991, the plaintiff's partner approached him with a proposal to buy out his stock in Common Brothers, Inc. On May 31, 1991, the plaintiff's partner bought the plaintiff's stock in Common Brothers, Inc. for ten million ($10,000,000.00) dollars. After taxes, the plaintiff netted between six million three hundred thousand ($6,300,000.00) dollars and six million five hundred thousand ($6,500,000.00) dollars. Most of this money was put into an account with the Trust Company of the West ("TCW"). The plaintiff has lived off of the principal and interest of the money he made from the sale of his Common Brothers, Inc. stock.
Subsequent to the sale of the Common Brothers, Inc. stock, the plaintiff was involved in several substantial lawsuits. After the lawsuits were settled, the plaintiff felt he would be a target for future litigation because of the substantial assets in his name. Therefore, he spoke to the defendant about transferring the TCW assets out of his name and into her name to avoid those assets from being the subject of attachment or execution in any future lawsuit. The defendant agreed to this course of action. In furtherance of this agreement, the parties modified the Agreement with a separate Modification Agreement. Exhibit A. The Modification Agreement stated that all the assets being held by TCW in the plaintiff's name had been CT Page 90 transferred to a TCW account in the defendant's name; if either party should "obtain a decree of dissolution or legal separation, the (defendant) agrees that all assets in her TCW account shall be returned to the (plaintiff)". After the assets have been returned to the plaintiff "the (defendant) shall be entitled to receive all amounts due her pursuant to the express terms of t(he) Agreement". The Modification Agreement also ratifies and confirms the provisions of the Agreement. Exhibit A. The plaintiff executed the Modification Agreement on January 17, 1994. The defendant executed the Modification Agreement on December 23, 1993. On December 23, 1993, the parties exchanged sworn Financial Affidavits. Exhibits RR and VV. The basis for the plaintiff's affidavit for the amount in his Citigold account was the statement for the month of November, 1993, since the December, 1993 statement had not yet arrived from Citibank.[2]
Sometime around the parties entering into the Modification Agreement, the plaintiff gave the defendant, as a gift and/or as consideration for the Modification Agreement, a note in the amount of one hundred thousand ($100,000.00) dollars from Key Technologies, Inc. ("Key"). Sometime in 1994, the plaintiff, without the knowledge or consent of the defendant, had Key transfer the note out of the defendant's name and back into the plaintiff's name. Sometime in July, 1994, the plaintiff extended the due date of the note from July 15, 1994 to August or September, 1994. In consideration of this extension, the plaintiff received twenty-one thousand shares of Key stock and/or warrants from Key. The plaintiff claims that sometime in July or August, 1995, he had the Key note, stock and/or warrants transferred back to the defendant's name. However, the plaintiff produced no credible evidence of the transfer of said note, stock and/or warrants back to the defendant's name. The only evidence the plaintiff produced was a letter sent to the defendant on March 2, 1995 by a "Jimmie C. Brockbank", written on Key stationary, with several enclosures. Exhibit GGG-1. The enclosures included a note from Key made payable to the defendant, dated October 21, 1993, in the amount of one hundred thousand ($100,000.00) dollars. Exhibit GGG-3. Said note had typed on the top, "Marcy[sic] 1, 1995-Replaces lost original payable to Jonathan Tendler."[3] Also included were a Key stock certificate, a restated bridge financing agreement, both dated November 1, 1993, an undated common stock warrant and a blank subscription form. Exhibits GGG-2, 4, 5 6. All of these documents, except the blank subscription form, were in the name of the defendant. Neither party produced any evidence of the CT Page 91 actual present value of the Key note, stock and/or warrants.
The parties have a joint 20th Century Mutual Funds account with approximately eleven thousand seven hundred ($11,700.00) dollars. The parties also had a joint account at The Bank of Darien. In March, 1994, the plaintiff removed ten thousand ($10,000.00) dollars from the account and the defendant removed twelve thousand ($12,000.00) dollars from the account. No other money remained in the account.
The parties have a joint 1993 tax refund in the total amount of forty-one thousand one hundred seventy-five ($41,175.00) dollars being held in escrow. Said refund came from the parties filing a joint tax return for 1993.
The defendant expended four thousand seven hundred ($4,700.00) dollars from the sale of her automobile toward the purchase of the plaintiff's Jeep. The defendant also expended ten thousand ($10,000.00) dollars toward the purchase of furniture which remains in the plaintiff's residence.
On December 13, 1995, the parties entered into two stipulations regarding the filing of Joint Tax returns for the years 1994 and 1995. The court finds these stipulations to be fair and equitable under all the circumstances and incorporates them by reference into this decree.
On December 13, 1995, by motion of the plaintiff, the court ordered that the defendant transfer, from the TCW account, to each party a total of twenty-nine thousand nine hundred sixteen and sixty-nine/100 ($29,916.69) dollars, each. The plaintiff was ordered to use ten thousand ($10,000.00) dollars towards the costs of a winter vacation with his children and nineteen thousand nine hundred sixteen and sixty-nine/100 ($19,916.69) dollars for attorney's fees. The defendant was ordered to use ten thousand ($10,000.00) dollars towards any of her needs as she deemed appropriate and nineteen thousand nine hundred sixteen and sixty-nine/100 ($19,916.69) dollars for attorney's fees. In 1994, the defendant also received a one hundred seventy-eight thousand one hundred thirty-eight ($178,138.00) dollars distribution, which the parties agree should be deducted from any award the court grants the defendant. The court will reflect these distributions in its final orders of this decision. CT Page 92
The court needs first to address the validity and enforceability of the Postmarital Agreement and the subsequent Modification Agreement. The Agreement states that the choice of law for any interpretation or determination of validity of said Agreement shall be the Commonwealth of Virginia. Exhibit B. Section 20-155 of the Code of Virginia provides: "Married persons may enter into agreements with each other for the purposes of settling the rights and obligations of either or both of them, to the extent, with the same effect, and subject to the same conditions, as provided in §§ 20-147 through 20-154
for agreements between prospective spouses, except that such marital agreements shall become effective immediately upon their execution." A postmarital agreement entered into prior to an unsuccessful reconciliation attempt by the parties has been specifically enforced by the Court of Appeals of Virginia.Smith v. Smith, 19 Va. App. 155, 449 S.E.2d 506 (1994). Both parties testified that the Agreement was fair and equitable. The court finds that the Agreement was fair and equitable, valid and enforceable pursuant to Virginia law.
The question remains as to the validity and enforceability of the Modification Agreement. Section 20-153 of the Code of Virginia states that a postmarital agreement may be amended only by a written agreement signed by the parties. Section 20-153
also states that such an amended agreement may be enforceable without consideration. The Modification Agreement was in writing and signed by both parties. Exhibit A. The Modification Agreement ratified and confirmed the provisions of the Agreement, including the choice of law provision. Section 20-151 of the Code of Virginia provides in pertinent part that there be a "fair and reasonable disclosure" of the other party's "property and financial obligations". The court has previously found that such disclosure was made prior to the execution of the Modification Agreement. Under Virginia law, the Modification Agreement is valid and enforceable.
The defendant contends that Connecticut law should apply to the Modification Agreement. The court finds that even if Connecticut law is used the Modification Agreement is valid and enforceable. The Modification Agreement was entered into by the parties to attempt to insulate the plaintiff's substantial TCW assets by putting them into the name of the defendant. The defendant needed these assets to be insulated in order for them to be available to the plaintiff to satisfy the provisions of the Agreement. The court finds there was ample consideration CT Page 93 for the Modification Agreement. Musk v. Musk,1991 Ct. Super. 901 (1991). The court also finds that the Modification Agreement was made solely for the purpose of amicably settling the parties property affairs and were not made to facilitate a divorce. Rifkin v. Rifkin, 155 Conn. 7 (1967). The court also finds that the Modification Agreement is fair and equitable under all the circumstances. Hayes v. Beresford, 184 Conn. 558,567 (1981).
The court further finds that both Agreements were validly entered into, the terms of both Agreements do not violate public policy and the circumstances of the parties today are not so beyond the contemplation of the parties at the time they entered into both Agreements. Mchugh v. McHugh, 181 Conn. 482, 485, (1980).
The Agreement and Modification Agreement do not cover all of the issues in this case. For the issues not covered by said agreements, the court must look to Connecticut law. The court has considered all of the criteria of §§ 46b-81 and 46b-82 and46b-62 of the General Statutes together with all of the evidence and the case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account", Scherr v.Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weimanv. Weiman, 188 Conn. 232, 234 (1982). Suffice to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding,Leo v. Leo, R197 Conn. 1, 5 (1985), and that the court need not give equal weight to each factor. Kane v. Parry, 24 Conn. App. 307,313-14 (1991).
The court, in addition to the foregoing findings, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the complaint have been proved and are true.
3. There has been an irretrievable breakdown of the marriage. CT Page 94
4. Neither party is at fault for the breakdown of the marriage.
The court enters the following orders:
Pursuant to the Agreement and Modification Agreement, the defendant is ordered to immediately transfer all the assets in the TCW accounts to the plaintiff. Pursuant to paragraph three of the Agreement, the plaintiff shall pay to the defendant the sum of three hundred fifty thousand ($350,000.00) dollars less the seventy thousand-five ($75,000.00) dollars the plaintiff has paid to the defendant pursuant to said paragraph three.[4]
Pursuant to paragraph five of the Agreement, the plaintiff shall pay to the defendant the sum of one hundred sixty-seven thousand one hundred twenty ($167,120.00) dollars.
Pursuant to paragraph seven of the Agreement, the furniture bought with the defendant's money is considered a marital asset and is to be divided equally. The court, however, is not going to order the furniture to be divided between the parties. The court is going to order the furniture to remain with the plaintiff. However, the plaintiff is ordered to immediately pay the defendant ten thousand ($10,000.00) dollars as reimbursement for the money she expended on said furniture.
Pursuant to paragraph seven of the Agreement, the plaintiff's Jeep, which was acquired with some of the defendant's money, is considered a marital asset. The Jeep shall remain the plaintiff's. However, the plaintiff is ordered to immediately pay the defendant four thousand seven hundred ($4,700.00) as reimbursement for the money she contributed towards said Jeep.
Pursuant to paragraph seven of the Agreement, the approximately eleven thousand seven hundred ($11,700.00) dollars in the 20th Century Mutual Funds are a marital asset and are ordered divided equally between the parties.
Pursuant to paragraph seven of the Agreement, the forty-one thousand one hundred seventy-five ($41,175.00) dollars 1993 tax refund is a marital asset and is ordered to be divided equally between the parties.
The plaintiff is ordered to produce and transfer to the CT Page 95 defendant, within thirty days of this decision, a Key note in the amount of one hundred thousand ($100,000.00) dollars with the same terms and conditions as Exhibit GGG-3, Key stock certificate for twenty-one thousands shares as Exhibit GGG-2 and warrants for Key stock with the same terms and conditions as set forth in Exhibit GGG-5 that are all dated sometime in August, 1995. If the plaintiff cannot produce said documents within said thirty days he shall pay one hundred thousand ($100,000.00) dollars to the defendant within forty-five days of this decision.
The court orders the defendant to pay to the plaintiff one thousand ($1,000.00) dollars which represents one half of the difference between the defendant's twelve-thousand ($12,000.00) dollar withdrawal from the parties Bank of Darien joint account and the plaintiff's ten thousand ($10,000.00) dollar withdrawal from said Bank of Darien joint account.
Pursuant to the stipulations entered into by the parties on December 13, 1995, the parties are ordered to file joint tax returns for the years 1994 and 1995. Said stipulations are ordered incorporated by reference into this decision and are now orders of this court.
The court awards the defendant and orders the plaintiff to immediately pay to the defendant forty thousand ($40,000.00) dollars as a reasonable attorney's fee.
Neither party is awarded alimony.
All assets and liabilities, other than those mentioned in this decision, shall remain the assets and liabilities of the parties according to their respective financial affidavits.
In conclusion, the plaintiff is ordered to pay to the defendant the total sum of five hundred seventy-one thousand eight hundred twenty ($571,820.00) dollars; less the seventy five thousand ($75,000.00) dollars paid pursuant to paragraph three of the Agreement; less the twenty-nine thousand nine hundred sixteen and 69/100 ($29,916.69) dollar distribution; less the one hundred seventy-eight thousand one hundred thirty eight ($178,138.00) dollar distribution; less the one thousand ($1,000.00) dollars the defendant is ordered to pay the plaintiff for the equalization of the Bank of Darien joint account; for an actual total payment from the plaintiff to the CT Page 96 defendant of two hundred eighty-seven thousand seven hundred sixty-five and 31/100 ($287,765.31) dollars. In addition, the 20th Century Mutual Funds and the 1993 tax refund are ordered equally divided between the parties. Finally, the plaintiff is ordered to produce and transfer to the defendant the Key documents or pay to the defendant the additional one hundred thousand ($100,000.00) dollars, as ordered above.
MINTZ, J.